Filed 9/22/17; Certified for Publication 10/19/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GISSELLE MORALES-SIMENTAL, a Minor, etc., et al., | A145865 |
| Plaintiffs and Appellants, | |
| v. | (Alameda County Super. Ct. No. HG13678136) |
| GENENTECH, INC., | |
| Defendant and Respondent. | |

## I.    INTRODUCTION

Plaintiffs and appellants Gisselle Morales-Simental, a minor, et al.[1] appeal from summary judgment granted in favor of defendant and respondent Genentech, Inc., one of the defendants in this personal injury case. Morales-Simental alleges that she, with the other named plaintiffs, suffered injuries and sustained damages as a result of the negligence of defendant Vincent Inte Ong, an employee of Genentech, when Ong's vehicle collided with the vehicle in which the decedent was riding.

The issue presented to us is whether Genentech's employee, Ong, was acting within the scope of his employment when he was involved in the automobile collision that killed Marisol Morales. Genentech asserts the trial court correctly determined the

---

[1] Gisselle Morales-Simental is the daughter of the deceased, Marisol Morales. Plaintiffs and appellants Walter Morales, Sr. and Wilma Morales are the parents of the deceased. Plaintiff and appellant Louis Deandre Gonzalez, Jr. is the fiancé of the deceased.

1

"going and coming" rule precludes Genentech's liability because Ong was driving to Genentech for his own convenience and not at Genentech's request or as part of his regular duties. Plaintiffs argue Genentech is liable under the "special errand" exception to the going and coming rule because at the time of the collision Ong was on a special errand requested by Genentech or as part of his regular duties. Plaintiffs contend there are triable issues of material fact as to whether Ong was on a special errand for Genentech at the time of the accident, and there were issues of credibility precluding summary judgment.

We conclude plaintiffs have failed to establish triable issues of material fact supporting the special errand exception sufficient to overcome summary judgment for Genentech. Accordingly, we affirm.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In the early morning of December 13, 2012, Ong's vehicle collided with a vehicle driven by Louis Deandre Gonzalez, Jr. A passenger in the Gonzalez vehicle, Marisol Morales, was killed in the collision. The accident occurred at approximately 3:35 a.m. on State Route 92 on the San Mateo Bridge. Ong owned the vehicle he was driving.

California Highway Patrol Officer Michael Aquino responded to the scene of the accident and served as the lead investigator. He interviewed Ong first on-scene and three more times in the following days. During the first interview at the scene of the collision, Ong said he was driving to Genentech in South San Francisco on his night off to collect resumes for "some upcoming interviews he had." Ong told Officer Aquino that he worked the night shift at Genentech. Officer Aquino did not recall Ong mentioning any other purpose for his trip. At about midnight, a few hours before the accident, Ong told his friend Dan Alvarez that he was going to Genentech to do something important for work.

During his deposition, Ong gave various reasons for his trip to Genentech that morning. Ong testified that he intended to stop at Genentech to retrieve old resumes he had left in his mailbox and some personal belongings from his locker on his way to visit his grandmother in hospice care in South San Francisco. He also said one purpose of the

2

trip to Genentech was to pick up the resume of his unemployed friend, Dan Alvarez, who had asked Ong if he could recommend Alvarez for a job. Ong's testimony with respect to Alvarez's resume was impeached; Alvarez stated he does not have a resume and never gave one to Ong.

Genentech is a biotechnology company that uses human genetic material to develop and manufacture pharmaceuticals. At the time of the accident, Ong was employed as a lead technician on the N1 (night) shift of Genentech's Equipment Preparation division at its headquarters in South San Francisco, California. The Equipment Preparation division cleans and sterilizes the tanks used to manufacture drugs at Genentech facilities. Marc Tumaneng was Ong's supervisor. Ong's regular shift at Genentech was Sunday, Monday, and Tuesday nights, and alternating Saturday nights, from 7:00 p.m. to 8:00 a.m. Ong's duties as lead technician included assessing workload and assigning tasks to the other technicians on his shift. Genentech presented evidence that all of Ong's lead technician duties were performed at Genentech during work hours.

Ong resided in Hayward, California and commuted to Genentech in his own vehicle. Genentech never owned, leased, or possessed Ong's 1999 Range Rover or Land Rover, the vehicle he was driving at the time of the accident. Genentech did not require Ong to drive or own a vehicle, and did not compensate Ong for travel time or expenses.

As lead technician on his shift, Ong participated with Tumaneng in conducting interviews and hiring. Beginning in the summer of 2012, Genentech increased its run rate for drug production. That same year, Genentech began receiving more tanks for sterilization, at least in part due to a problem with mold found in tanks that were improperly cleaned in Singapore. As a result, the Equipment Preparation division's workload increased in 2012, and Genentech added an additional night shift and hired more labware technicians. Tumaneng testified that this December 2012 hiring was conducted at least in part to replace "several" technicians who had recently quit the N1 shift. Genentech hired through an agency called PRO Unlimited. Tumaneng's role in the hiring process included using a computer program called WAND to select candidates from PRO Unlimited to interview.

3

A few days before the accident, Ong and Tumaneng together interviewed six candidates for two open positions on the N1 shift. On Monday, December 10, 2012, after completing the six interviews, Tumaneng and Ong chose two candidates to hire. The work week for Ong and Tumaneng ended at 8:00 a.m. on Wednesday, December 12. On Wednesday, December 12, 2012 at 3:37 p.m., while he was off-duty, Tumaneng received an email from Maybelle Gonzales, a Client Services Coordinator at PRO Unlimited, advising him that Genentech's human resources department had rejected one of the two candidates he and Ong had chosen. At 5:53 p.m., Tumaneng replied to Gonzales's email to say he would look into other candidates; Tumaneng copied Ong on the reply email. By 6:06 p.m., through WAND, Tumaneng had chosen four additional candidates to schedule for interviews.

At 6:06 p.m. on December 12, 2012, PRO Unlimited, also through WAND, sent Ong four automated messages. The body of each email stated that it was an "automated email from the WAND system." Each email stated that Tumaneng had requested an interview and gave the candidate's name, but did not show that any interviews had been scheduled. The evidence does not establish whether Ong opened any of those emails before the time of the accident at 3:35 a.m. on December 13, 2012; however, Ong stated he can access his work email on his personal cell phone.

Plaintiffs filed a complaint in May 2013 alleging Ong and Genentech were both liable for the accident that caused Marisol Morales' death, asserting causes of action for motor vehicle negligence and general negligence, together with a survivorship action. Plaintiffs' claim against Genentech was based on the doctrine of respondeat superior. Genentech moved for summary judgment. Although the trial court issued a tentative ruling in plaintiffs' favor,[2] following argument it reversed course and granted the motion. The court then entered judgment in favor of Genentech, dismissing it from the case and leaving Ong as the sole defendant. This timely appeal followed.

---

[2] The trial court's tentative ruling of March 2, 2015 does not appear in the record, despite plaintiffs' request that it be included.

4

### III. DISCUSSION

#### A. Standard of Review

We review the trial court's entry of summary judgment de novo. (*Nazir v. United Airlines, Inc*. (2009) 178 Cal.App.4th 243, 253.) "[S]ummary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A moving defendant can meet its initial burden by showing that one or more elements of the plaintiff's cause of action cannot be separately established. (*Nazir, supra,* 178 Cal.App.4th at p. 253.) Once the defendant meets the initial burden, the burden shifts to the plaintiff to show the existence of a triable issue of material fact. (*Ibid.*)

On appeal, we view the evidence in the light most favorable to the plaintiffs as the parties opposing summary judgment, and we liberally construe the plaintiffs' evidence and strictly scrutinize the defendant's evidence, resolving ambiguities in the plaintiffs' favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) On appeal, "we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

The weight of authority holds that the standard for reviewing the trial court's evidentiary rulings is abuse of discretion (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852), but there is some dispute as to whether evidentiary rulings made in the summary judgment context should instead be reviewed de novo (see *In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 141). We need not resolve this issue, because, as we discuss below, our conclusions as to the evidentiary issues raised on appeal would be the same under either standard. An appellate court's review of the evidence on summary judgment does not include evidence to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c).)

5

### B. Applicable Principles of Respondeat Superior, the Going and Coming Rule, and the Special Errand Exception

Under the doctrine of respondeat superior, an employer is vicariously liable for the tortious conduct of its employees within the scope of their employment. (*Jorge v. Culinary Institute of America* (2016) 3 Cal.App.5th 382, 396.) " '[T]he modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. [¶] The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business.' " (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959–960 (*Hinman*).) The principal justification for the application of the doctrine of respondeat superior is that the employer may spread the risk through insurance and carry the expense as part of its costs of doing business. (*Johnston v. Long* (1947) 30 Cal.2d 54, 64.)

The scope of employment has been interpreted broadly under the respondeat superior doctrine in California. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004.) Acts necessary for the employee's comfort or convenience at work, or where an employee is tending to his own business at the same time as that of his employer, do not remove the employee from the scope of employment, " ' "unless it clearly appears that neither directly nor indirectly could he have been serving his employer." ' " (*Ibid*.) The employer's liability extends to risks inherent in or incidental to the employer's enterprise. (*Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618–619.)

Nevertheless, there are exceptions to the respondeat superior doctrine. (*Hinman, supra,* 2 Cal.3d at p. 960.) Under the going and coming rule, for example, an employee commuting to or from work is typically outside the scope of employment, and the employer is not liable for the employee's torts. (*Id*. at p. 961, citing 1 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 448–449.) "The 'going and coming' rule is sometimes ascribed to the theory that the employment relationship is 'suspended' from the time the employee leaves until he returns [citation], or that in commuting he is not rendering

6

service to his employer [citation]." (*Hinman, supra,* 2 Cal.3d at p. 961.) With a few exceptions, employees are not within the scope of employment while commuting. (*Ibid.*)

One exception to the going and coming rule is the special errand rule, which provides that an employee is within the scope of his employment while performing an errand either as part of his regular duties or at the specific order or request of his employer. (*Boynton v. McKales* (1956) 139 Cal.App.2d 777, 789 (*Boynton*).) "[T]he employee is considered to be in the scope of his employment from the time he starts on the errand until he has returned or until he deviates therefrom for personal reasons." (*Ibid.*) The employer is liable for the employee's torts in the course of a special errand because the errand benefits the employer. (*Ibid.*) It is not necessary that the employee is directly engaged in his job duties; included also are errands that incidentally or indirectly benefit the employer. (*Ibid.*) It is essential, however, that the errand be either part of the employee's regular duties or undertaken at the specific request of the employer. (*Ibid.*)

Many court decisions on the going and coming and special errand rules include some discussion of workers' compensation law. (*Harris v. Oro-Dam Constructors* (1969) 269 Cal.App.2d 911, 913–914 (*Harris*).) Workers' compensation decisions construe the scope of employer liability more broadly than do tort cases. (*Munyon v. Ole's, Inc.* (1982) 136 Cal.App.3d 697, 702–703 (*Munyon*).) Instead of the tort law requirement that an employee be acting within the "scope of employment," workers' compensation cases use the phrase, " 'arising out of and occurring in the course of employment,' " which has been interpreted to include activities such as collecting a paycheck or commuting to work where the employee receives a per diem allowance for travel expenses. (*Id.* at pp. 701–702; see *Anderson v. Pacific Gas & Electric Co.* (1993) 14 Cal.App.4th 254, 259 (*Anderson*).) One reason for the broader interpretation is that the goal of workers' compensation law is to reimburse the injured worker, whereas the object in tort cases is to determine whether vicarious liability should be extended beyond those who were directly negligent. (*Munyon, supra,* 136 Cal.App.3d at p. 702.) "Workers' compensation decisions can be helpful in determining whether an employer

should be vicariously liable, but they are not controlling precedent." (*Anderson, supra,* 14 Cal.App.4th at p. 259.)

Whether an employee was acting within the course and scope of his employment is generally a question of fact, but if the facts are undisputed and no conflicting inferences are possible, the question is one of law. (*Munyon, supra,* 136 Cal.App.3d at p. 701.)

## C. Plaintiffs' Three Causes of Action

Plaintiffs seek damages pursuant to three causes of action against Ong and Genentech: two in the form of negligence claims (for motor vehicle negligence and general negligence, respectively), and one in the form of a survivorship action incorporating the negligence allegations. Plaintiffs allege they suffered injuries and sustained damages as a result of the negligence of defendant Ong when his vehicle struck the vehicle of Marisol Morales, resulting in her injury and death. It is undisputed that Ong was the driver and owner of the vehicle that hit the vehicle in which Marisol Morales was a passenger. Accordingly, the only theory of Genentech's liability as to all three causes of action is the doctrine of respondeat superior, as Ong's employer.

Genentech asserts the material facts show that, at the time of the accident, Ong was not performing a special errand for Genentech as a matter of law, since he was not acting on a special request from Genentech or as part of his regular duties. Plaintiffs contend there are triable issues of material fact as to whether, at the time of the accident, Ong was performing a special errand for Genentech. Plaintiffs advance three arguments to bring Ong's trip within the special errand exception: 1) Ong, as a lead technician tasked with hiring, could order himself to perform a special errand in connection with that task; 2) the emails of December 12, 2012 were a request to Ong to perform a special errand to complete the hiring; and 3) Ong's trip to Genentech on his night off to review resumes was within his regular duties at Genentech.

We address each argument in turn to determine whether it creates a triable issue of material fact as to whether, at the time of the accident, Ong was engaged in a special errand either at Genentech's request or as part of his regular duties.

8

1. *Ong, As a Shift Lead Who Was Tasked with Hiring, Could Not Request Himself to Perform a Special Errand on Genentech's Behalf.*

First, plaintiffs contend the evidence supports a reasonable inference that Genentech delegated authority to Ong as a shift lead tasked with hiring responsibilities, and that Ong's decision to drive to Genentech on December 13, 2012 to review resumes was a reasonable exercise of that authority. Plaintiffs argue this creates a triable issue of material fact as to whether Ong had the authority to request the errand of himself on Genentech's behalf. We disagree.

The appellate court in *Vivion v. National Cash Register Co.* (1962) 200 Cal.App.2d 597, 601, 603–606 (*Vivion*) affirmed a jury verdict releasing the employer from liability, holding the jury could determine that the employee was not acting within the scope of employment when she decided independently to drive to her workplace outside of working hours, without any request or expectation from her employer. In *Vivion*, an employee (Rauscher) decided to return to her workplace after her shift to practice using an accounting machine she was responsible for demonstrating the following day. (*Id*. at p. 603.) On her drive home after practicing at the office, Rauscher was involved in a collision. (*Ibid*.) Rauscher, like her fellow employees, had a key to the office, but her employer did not require her to work overtime or to come in after hours for additional training. (*Id*. at pp. 603–604.) No supervisor or any other employee had asked Rauscher to go to the office that evening. (*Id*. at p. 604.)

*Vivion* was not decided at summary judgment, but instead went to the jury, which found in favor of the employer. (*Vivion, supra,* 200 Cal.App.2d at pp. 600–601.) In affirming the judgment, the appellate court in *Vivion* observed that the mere fact that a trip may be related to an employee's job does not impose liability on the employer. (*Id*. at p. 606; see *Harris, supra,* 269 Cal.App.2d at p. 917 ["It is said that the right of control 'goes to the very heart of tortious responsibility.' [Citation.] . . . [Citation.] The question is one of a right to control the trip."].) The *Vivion* court held that, to bring an employee's

trip within the special errand exception, the employer must request or at least expect it of the employee.  (*Vivion,* at p. 606.)

Furthermore, in *Munyon, supra,* 136 Cal.App.3d at pp. 706–707, the appellate court affirmed summary judgment for the employer because there were no triable issues of material fact as to whether the employee (Edwards) was on a special errand when she went to her workplace on her day off to pick up her paycheck.  Edwards, a hardware store cashier, did not use her car at work, and her employer did not require her to have a car.  (*Id*. at p. 700.)  After picking up her paycheck, Edwards was involved in a traffic accident on her way home.  (*Ibid*.)  The court rejected plaintiff's argument that the employer created the risk by holding her paycheck, reasoning that such a theory was "too attenuated and does not comport with the realities of commercial and industrial relationships."  (*Id*. at p. 706.)  The *Munyon* court held that Edwards' trip to pick up her paycheck was undertaken for her own convenience, not at the request of her employer, and therefore did not come within the special errand exception.  (*Id*. at pp. 700, 706.)

On the other hand, in *Jeewarat v. Warner Bros. Entertainment Inc.* (2009) 177 Cal.App.4th 427, 436 (*Jeewarat*), the court reversed summary judgment for the employer (Warner), holding that an employee's attendance at a business conference authorized and funded by the employer may come within the special errand exception.  There, the employee (Brandon) was vice-president of anti-piracy internet operations at Warner.  (*Id*. at p. 431.)  Brandon was involved in a traffic accident while driving home from the airport after attending an out-of-town business conference sponsored by one of Warner's anti-piracy vendors.  (*Id*. at pp. 431–432.)  The *Jeewarat* court held the evidence Warner paid for Brandon's airfare, hotel, and airport parking, coupled with the reasonable inference that Warner would benefit from the information Brandon learned at the conference, created triable issues of material fact as to whether the business trip was a special errand.  (*Id*. at pp. 437, 438–439.)

In this case, like the employees in *Vivion* and *Munyon*, Ong, on his own, for his own reasons in the pre-dawn hours of December 13, chose to drive to Genentech.  The record shows no evidence that anyone from Genentech requested that Ong drive to

10

Genentech in the dead of night. Ong testified in his deposition that he did not expect to be paid for the trip. And in contrast to *Jeewarat*, there was no evidence Genentech authorized Ong's trip by paying his travel expenses.

Plaintiffs point out that, unlike the employee in *Vivion* who had no authority to assign or delegate tasks, Ong was a shift lead whose duties included assigning tasks to other technicians on his shift. They assert that Ong, as a supervisorial employee tasked with hiring, had authority to act on Genentech's behalf and, in essence, request himself to complete a special errand connected to that task. This argument finds no support in the extensive body of going and coming case law, and we decline plaintiffs' invitation to expand the special errand exception in the manner they suggest. What they propose is an invitation to self-serving pretense by anyone with a plausible claim to supervisorial authority.

Even in *Jeewarat*, where the employee was a vice-president, the court did not base its conclusion on a theory that the vice-president had the authority to order himself to go on the business trip on Warner's behalf; instead, an important factor in the court's decision was Warner's authorization of the trip by paying the vice-president's travel expenses. (*Jeewarat, supra,* 177 Cal.App.4th at p. 437.) Ong was a shift lead with less authority than the vice-president in *Jeewarat*, and he worked under his direct supervisor, Tumaneng. We cannot accept the theory that Ong had the authority to order himself to perform a special errand for Genentech. Such reasoning would expand the special errand rule to allow employees at various levels to request special errands of themselves on behalf of their employers, thereby stripping the employer of the ability to control when it will be liable for an employee's off-shift activities.

In its order granting summary judgment for Genentech, the trial court observed that even in workers' compensation cases, which embrace the more lenient standard of " 'arising out of and occurring in the course of employment' " (see *Munyon, supra,* 136 Cal.App.3d at pp. 701, 702), an employee's decision to take work home or to drive to work at an unusual time does not bring the trip within the scope of employment. Plaintiffs cite several workers' compensation cases in order to distinguish them from the

11

facts here, but as noted, workers' compensation cases are not controlling precedent in tort cases. (*Anderson, supra,* 14 Cal.App.4th at p. 259.) Even accepting as true plaintiffs' assertion that Ong took it upon himself to drive to Genentech on his day off to respond to a hiring crisis, under *Vivion*, an employee's unilateral decision to commute to work after hours does not bring the trip within the special errand rule. (*Vivion, supra,* 200 Cal.App.2d at p. 606.) We reject the argument that Ong could order himself to perform a special errand on Genentech's behalf.

> 2. *The Hiring Assignment, Coupled with the Genentech Emails of 12/12/12 Advising Further Action Was Necessary, Was Not a Request to Ong to Perform a Special Errand to Complete the Assigned Hiring Task.*

Next, plaintiffs argue that, because Genentech gave Ong the ongoing assignment of assisting with the allegedly urgent hiring, and because Ong received emails on December 12, 2012 advising further action was necessary, it can be inferred that those emails constituted a request by Genentech to Ong to perform a special errand. Again, we must disagree.

In *Boynton, supra,* 139 Cal.App.2d at p. 791, the appellate court upheld the verdict against the employer (McKales), holding the jury could reasonably infer that the employee (Brooks) was on a special errand for his employer when he caused an accident on his way home from a company banquet. While McKales argued the banquet was purely a social function Brooks chose to attend for his own enjoyment, the facts showed it was an annual company banquet where the vice-president of sales honored employees for their years of service. (*Id.* at pp. 790–791.) Attendance was not compulsory, but was expected, and McKales may have benefitted from the banquet by encouraging long-term employment. (*Id.* at p. 791.) Nonetheless, *Boynton* made clear that it is not enough for the errand to benefit the employer; the employer must also request or expect the employee to attend. (*Id.* at pp. 789, 791.)

In *Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1059–1060 (*Tognazzini*), the appellate court affirmed a jury verdict releasing the

employer (the District) from liability for an accident caused by the employee (Ho) while she was on her way home from fingerprinting. Ho worked for the District as a tutor, and the state required all persons working with children to be fingerprinted. (*Id*. at p. 1056.) The District itself did not mandate fingerprinting, but Ho's supervisor at the District told her about the state law requirement and gave her a phone number to call to make an appointment. (*Ibid*.) Ho was free to choose the date, time, and location of the fingerprinting appointment, and the District did not pay her travel expenses. (*Id*. at p. 1058.) The *Tognazzini* court upheld the conclusion that Ho was not on a special errand for the District at the time of the collision, noting that the fingerprinting was not a direct request of the District, but rather was a state mandate, and because Ho paid her own travel expenses, controlled her own method of travel, and chose when and where to fulfill the requirement. (*Id*. at pp. 1058–1059.)

In contrast to *Boynton*, the facts in this case do not create a reasonable inference that Genentech expected Ong to drive to work on the early morning of December 13, 2012, to respond to a hiring crisis. In *Boynton*, the employee received an invitation to attend a company banquet, and the practice of honoring employees for their service created an inference that attendance was not only invited, but expected. (*Boynton, supra*, 139 Cal.App.2d at pp. 790–791.) Here, the day before the accident, Ong was copied on an email from Tumaneng, and received automated emails from PRO Unlimited, letting him know that one of the new hires had fallen through and further interviews were necessary. It is not clear whether Ong read these emails before the collision, but even assuming he did, and assuming he decided to drive to Genentech on the morning of December 13, 2012 to prepare for those interviews, there is still no evidence that anyone at Genentech requested or expected that Ong would drive to work that morning.

Moreover, even if it could be inferred that Ong read the emails before driving to Genentech and those emails constituted a request that Ong continue to assist with the hiring process, it is clear they did not require Ong to come in at a specific day or time. Even though *Tognazzini* involved fingerprinting ordered by the state and not by the employer, it was also germane to the court's decision that the employee had full control

13

over when and where she completed the requirement, and over her means of transportation. (*Tognazzini, supra,* 86 Cal.App.4th at pp. 1058–1059.) On this record, even if the December 12 emails to Ong could be interpreted as a request to continue work on the overall assignment of hiring, they cannot be interpreted as a request that Ong drive to Genentech on December 13, or on any of his days off.

### 3. *Ong's Trip to Genentech Was Not Part of His Regular Duties of Hiring for the N1 Shift.*

Finally, Plaintiffs assert there are triable issues of material fact concerning the extent of Ong's hiring duties and whether they included driving to Genentech on his day off to review resumes. Again, we disagree.

In *Harvey v. D & L Constr. Co.* (1967) 251 Cal.App.2d 48, 49, 52–53 (*Harvey*), the appellate court reversed a nonsuit in favor of the employer (D & L), holding that the jury could reasonably infer that the employee (Chism) was on a special errand as part of his regular duties when he was involved in a collision while driving himself and a coworker (Richards) from their work site in Yuma, Arizona to their homes in Pasadena, California. Chism, an experienced cement finisher, first worked for D & L in California. (*Id.* at p. 49.) The D & L superintendent in Yuma, Arizona asked Chism several times to come to work there, and eventually he accepted. (*Ibid.*) The superintendent sought out Chism because he was having trouble keeping skilled cement finishers on the Yuma job due to the heat and the remoteness of the location. (*Id.* at pp. 50, 52.)

While Chism worked for D & L in Yuma, he drove home to Pasadena every weekend, sometimes using his own truck, which he was allowed to fill with D & L gas, or sometimes using his superintendent's truck. (*Harvey, supra,* 251 Cal.App.2d at p. 51.) Chism often used his truck to haul company supplies, both at the work site and as part of his commute. (*Ibid.*) Chism hired other cement finishers from California at D & L's request. (*Ibid.*) One of his hires, Richards, regularly rode with Chism on his weekend commute, and was a passenger in his truck at the time of the accident. (*Ibid.*) Chism testified that, on the weekend of the accident, D & L did not ask him to bring any employees or equipment on his return trip. (*Ibid.*) The *Harvey* court found that, even

14

though D & L made no specific request of Chism that weekend, there was sufficient evidence to support an inference that Chism was performing an errand for D & L as part of his regular duties at the time of the accident. (*Id*. at pp. 52–53.)

Here, the evidence does not support an inference that Ong's regular duties of hiring at Genentech included driving to work on his day off to review resumes. Unlike *Harvey*, where the employer regularly expected the employee to haul materials and recruit employees as part of his long-distance commute, there is no evidence Genentech ever expected Ong to come in outside of his normal working hours to assist with hiring. The evidence plaintiffs introduced to the contrary included that Ong sometimes worked overtime, and did so on December 10, 2012, to help Tumaneng complete the interviews scheduled that day. Plaintiffs also point to evidence that Ong attended once-monthly off-shift leadership meetings and occasionally communicated with coworkers on his days off by text or by phone. Evidence that an employee sometimes worked overtime, attended scheduled work meetings, and communicated with coworkers outside of working hours cannot support a reasonable inference that he was regularly expected to come into the office on his days off to review resumes.

Finally, plaintiffs rely on *Jeewarat, supra,* 177 Cal.App.4th at p. 437, contending that, like the vice-president whose regular duties were to prevent internet piracy, Ong's regular duties included hiring, and he was carrying out those duties at the time of the collision. They further argue that the *Jeewarat* court found that driving home from the airport was part of the vice-president's regular duties, without discussing whether the vice-president had ever driven a car as part of his job. The *Jeewarat* court, as we note above, did not base its holding on a theory that driving home from the airport was part of the vice-president's regular duties. (*Jeewarat, supra,* 177 Cal.App.4th at pp. 436–437.) Instead, the court concluded that the special errand doctrine may be applied to a business trip, and that Warner's payment of the vice-president's travel expenses could support a reasonable inference that Warner authorized the trip and expected to derive a benefit from the vice-president's attendance. (*Ibid*.) *Jeewarat*'s reasoning cannot support an argument that Ong was engaged in his regular duties at the time of the accident. Since

15

plaintiffs put forth no evidence that Ong had even once before made a special trip to Genentech to review resumes or perform any task connected to hiring, it cannot be inferred that such a trip was part of his regular duties in hiring.

### D. Credibility and Summary Judgment

Plaintiffs argue that contradictions in the declarations and deposition testimony of both Ong and Tumaneng raise credibility questions for the jury. They invoke Code of Civil Procedure section 437c, subdivision (e), which provides, "[i]f a party is otherwise entitled to summary judgment pursuant to this section, summary judgment shall not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court if the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact . . . ." (Code Civ. Proc., § 437c, subd. (e); see *Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 760.)

Plaintiffs contend that Ong and Tumaneng are the sole witnesses to the material fact of whether Tumaneng asked Ong to perform an errand connected to the hiring between 3:37 p.m. on December 12 and 3:35 a.m. on December 13, 2012. Ong denies that anyone from Genentech asked him to perform an errand during that time period, and Tumaneng states that he cannot remember whether he made any request of Ong. Plaintiffs note, further, that Ong gave inconsistent testimony about his reasons for driving to Genentech on December 13, 2012, and that one of those reasons, to pick up Alvarez's resume, was proven false. In addition, they point to supposed contradictions in Tumaneng's testimony as to the scope of Ong's duties as shift lead, the extent of Ong's involvement in hiring, when future interviews at Genentech were scheduled, and whether overtime at Genentech must be pre-approved.

Code of Civil Procedure section 437c, subdivision (e) focuses on the inability to cross-examine a witness who has not been deposed, but has submitted a declaration or affidavit. Here, Ong and Tumaneng both gave deposition testimony. Genentech deposed Ong in November 2013. Plaintiffs were unable to depose Ong because Ong asserted his

16

Fifth Amendment rights, and the criminal proceeding concerning the collision concluded on July 28, 2015. Meanwhile, according to plaintiffs, the civil action was stayed pending appeal from entry of summary judgment on June 16, 2015.

In its summary judgment order, the trial court acknowledged that Ong gave inconsistent testimony concerning his reasons for driving to Genentech that morning. The court then stated that, even resolving the conflict in plaintiffs' favor by taking as true Ong's statement that he was driving to Genentech to pick up resumes for upcoming interviews, there was still no evidence that anyone from Genentech asked Ong to drive to work on the early morning of December 13, 2012. In essence, the court found that any credibility issues surrounding Ong's testimony were not material to the resolution of the special errand issue on which the motion turned. Suffice it to say we agree.

### E.      Evidentiary Objections

As noted, there is an outstanding issue as to whether the standard for reviewing the trial court's evidentiary objections is de novo or abuse of discretion (*In re Automobile Antitrust Cases I & II, supra,* 1 Cal.App.5th at p. 141; *Serri v. Santa Clara University, supra,* 226 Cal.App.4th at p. 852), but we need not resolve the issue. Here, the trial court sustained objections to plaintiffs' Exhibits G, H, and I as irrelevant and immaterial. The trial court also noted its decision on summary judgment would be the same regardless of whether those exhibits were in evidence.

The sustaining of an objection to Exhibit I appears to have been inadvertent error, since Genentech did not raise an objection to that exhibit. Exhibit I is plaintiffs' Second Request for Production of Documents to Genentech and relevant portions of Genentech's responses, including Tumaneng's email of December 6, 2012, advising Genentech's hiring agency that he and Ong would be conducting the interviews of December 9 and 10, 2012. Since Genentech raised no evidentiary objection to Exhibit I, the trial court erred in excluding it from evidence, and we view it as properly admitted into evidence before the court. Having found it to be admissible, however, we do not see it as material.

The trial court sustained Genentech's objections to Exhibits G and H as irrelevant and immaterial. Exhibit G contains portions of plaintiffs' Second Request for Production

17

of Documents to Ong, and Ong's responses, including documentation of his overtime hours in 2012 and a chart showing the number of employees on Ong's shift in March 2013. Exhibit H contains portions of plaintiffs' First Request for Production of Documents to Genentech, and responses, including Ong's December 2012 work schedule and another chart showing the number of employees on his shift in April 2012. The trial court found that evidence of Ong's overtime and the number of employees on his shift was irrelevant and immaterial to its decision. Whether under the de novo standard or the abuse of discretion standard, we find no error on this point, since Ong's overtime hours and the number of employees on his shift are not essential to our analysis of whether Ong was on a special errand for Genentech at the time of the accident.

## IV. DISPOSITION

Affirmed.

18

_____
Streeter, J.

We concur:


_____
Ruvolo, P.J.


_____
Rivera, J.

Filed 10/19/17

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 4

GISSELLE MORALES-SIMENTAL, a minor, etc., et al.,
Plaintiffs and Appellants,
v.
GENENTECH, INC.,
Defendant and Respondent.

A145865
Alameda County No. HG13678136

BY THE COURT:

The written opinion which was filed on September 22, 2017, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.

(Ruvolo, P.J., Rivera, J. and Streeter, J. participated in the decision.)

Date:      October 19, 2017                          Ruvolo            P.J.

1

*Morales-Simental v. Genentech, Inc.* (A145865)

Trial court:               Alameda County

Trial judge:             Hon. Lawrence Appel

Attorneys:

Mastrangelo Law Offices, Nicholas J. Mastrangelo and Margaret Blodgett; Gillin, Jacobson, Ellis Larsen & Lucey and Luke Ellis for Plaintiffs and Appellants.

Ropers, Majeski, Kohn & Bentley and Stephan A. Barber; McNamara, Ney, Beatty, Slattery, Borges & Ambacher, Thomas G. Beatty, Michael P. Clark, and Wilma J. Gray for Respondent.