Filed 9/21/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JESSICA AYON, | |
|    Plaintiff and Appellant, | G054578, G055396 |
|      v. | (Super. Ct. No. 30-2015-00788413) |
| ESQUIRE DEPOSITION SOLUTIONS, LLC, | O P I N I O N |
|    Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila B. Fell, Judge.  Affirmed.

Law Offices of William D. Shapiro, William D. Shapiro and Brian D. Shapiro for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Allison A. Arabian; Marshall & French and Craig A. French for Defendant and Respondent.

\*        \*        \*

Plaintiff Jessica Ayon appeals from an adverse summary judgment in a personal injury case. Late one evening in May 2013, Brittini Zuppardo was driving home from her boyfriend's house while talking on the phone with Michelle Halkett. Zuppardo was defendant Esquire Deposition Solution's (Esquire) scheduling manager; Halkett was a court reporter for Esquire. Zuppardo's vehicle struck plaintiff, who suffered significant injuries. The issue here is whether Esquire can be held liable under a theory of respondeat superior.

In an interview immediately following the accident, Zuppardo reported to a police officer that she had been speaking with one of her court reporters, Halkett, about Halkett's son's prom and other family related issues. In their depositions, both Zuppardo and Halkett testified they were good friends and were talking about family matters on the evening of the accident. It was not within Zuppardo's job description to call court reporters after hours for work purposes, though on rare occasions she had done so.

To establish respondeat superior liability, plaintiff relies heavily on the following piece of evidence: at her deposition, Zuppardo testified she spoke on her cell phone with Halkett weekly, if not daily. Zuppardo's cell phone records, however, showed no calls between her and Halkett's cell phone for the prior six months, and only one text message. Plaintiff contends a jury could infer from this that the two did not, in fact, have a close friendship, and that the call concerned work matters, not personal matters.

Code of Civil Procedure section 437c, subdivision (e), provides that "summary judgment shall not be denied on grounds of credibility," with certain exceptions we discuss below, but which we conclude do not apply. Ultimately, plaintiff has no evidence that Zuppardo was operating within the scope of her employment at the time of the accident. Plaintiff attacks Zuppardo's and Halkett's credibility. But that is not enough, and thus the court correctly granted summary judgment.

FACTS

Esquire is a court reporting agency.  Esquire hired Zuppardo in 2005.  At the time of the accident, Zuppardo was the calendaring manager.  Her job was to interact with attorneys seeking to hire a court reporter, make certain that depositions and hearings were calendared correctly, and ensure they were covered by one of the approximately 30 court reporters who worked for Esquire.  Zuppardo scheduled depositions by entering data into a software program.  Typically, when an attorney called Esquire to schedule a deposition, Zuppardo would speak with the attorney and register the deposition in the software program.  Her working hours were approximately 8:30 a.m. to 5:00 p.m.

Zuppardo usually booked a reporter for a deposition the business day prior to the scheduled deposition date.  She would call available court reporters and leave a message if no one answered.  She would continue calling available reporters until she found someone to accept the job.  Using the phone was a critical part of Zuppardo's job.

At some point prior to the accident, Esquire issued Zuppardo a cell phone that she kept with her at all times.  While at the office, she did not use the company cell phone, but instead used the landline.  If someone needed to reach Zuppardo, they could call the after-hours answering service at the office, and the answering service would call Zuppardo's work cell phone to pass on a message.  This happened only rarely.  It was, however, part of her job.  On rare occasions, if a court reporter cancelled an appearance for a deposition the following day, Zuppardo would use her cell phone after hours to find a last-minute replacement.  Such after-hours tasks, however, were ordinarily the responsibility of the general manager.  Zuppardo did not have access to the calendaring software after hours, nor did she have access to all of the court reporters' phone numbers.  Zuppardo was supposed to log any hours she worked outside her normal working hours.

3

Sometime prior to the accident, Esquire disconnected her work cell phone, and it was not replaced. Afterwards, she would use her personal cell phone for work on the rare occasions she needed it.

Esquire had a policy forbidding employees from using a cell phone for work purposes while driving. A violation of the policy could result in firing.

Michelle Halkett was a court reporter who worked exclusively with Esquire around the time of the accident. She began working for Esquire in 2009, which is when she met Zuppardo. They would speak daily. Halkett would come into the office once or twice per week and make a point of greeting Zuppardo. Over the course of their employment with Esquire, the two became friends. Zuppardo was able to recite Halkett's cell phone number from memory at her deposition. Halkett testified that over the years she had been in Zuppardo's car approximately five times. They had attended the Orange County Fair together on a couple of occasions, and had dinner together on a couple of occasions. Zuppardo had been to Halkett's home approximately three times.

Concerning their friendship, Zuppardo offered the following testimony in her deposition:

"Q And with regard to Michelle Halkett, she was a close friend of yours, correct?

"A Very close.

"Q And the two of you would talk on the telephone on your cell phone quite a bit, correct?

"A Yes.

"Q About how often would you speak to Michelle on your cell phone?"

"A I don't know exactly.

"Q Daily or weekly?

"A Probably, yes.

"Q Which one? Daily?

4

"A  Daily or—

[¶] . . . [¶]

"Q  Would you say it was several times a week?

"A  Sometimes maybe.

"Q  Okay.  That wouldn't be unusual, would it?  That would not be unusual?

"A  Correct."

After Zuppardo offered this testimony, plaintiff's counsel obtained Zuppardo's cell phone records for the six months prior to the accident.  They did not reflect even a single phone call between Zuppardo's cell phone and Halkett's cell phone, other than the night of the accident.  They disclosed a single text message in February of 2013.

Zuppardo would schedule depositions for Halkett a few times per week.  However, neither could recall any times where Zuppardo scheduled a deposition with Halkett after hours using her cell phone.  Halkett testified that on the few occasions where she was contacted after hours, it was by the office manager.

The accident occurred on May 29, 2013, a Wednesday.  Zuppardo left work and spent the evening with her boyfriend, eating dinner, shopping, and visiting a friend's house.  She left around 10:10 p.m. to drive home.  When she got into the car, she called Michelle Halkett using her car's hands-free, Bluetooth phone system.  She testified she had no specific reason to call Halkett other than to chat with a friend.  According to Zuppardo's statement to the police on the night of the incident, they were casually conversing about Halkett's son's prom and other family issues.  She reiterated that position in her deposition and emphatically denied the conversation had anything to do with work.  Halkett was deposed and likewise testified the conversation was about her son and his prom.  Halket also testified the conversation had nothing to do with work.

5

Zuppardo was still speaking with Halkett when her vehicle struck plaintiff, who was walking across the street in dark clothing, not in a crosswalk. Zuppardo did not see plaintiff until the instant before impact.

A police investigator filed a report about the incident, some of which Zuppardo disagreed with at the time of her deposition. For example, according to the report, Zuppardo had dinner with her boyfriend, then went shopping, then went to a friend's house, but Zuppardo testified the dinner was later in the evening. The report stated Zuppardo had "narrowed down" the time of her departure based on the phone call she made, but Zuppardo denied it, saying, "I personally never narrowed down anything." The report said Zuppardo decelerated to 40 miles per hour before the impact in anticipation of a turn, but Zuppardo testified the correct number was 25 or 30 miles per hour. Perhaps the most significant discrepancy, according to plaintiff, is the report's recital that Zuppardo said she was on the phone with "one of her court reporters." Zuppardo testified that she told the police officer she was speaking with her "court reporter friend."

Plaintiff filed suit against Zuppardo and Esquire for personal injuries.[1] Esquire moved for summary judgment on the ground that plaintiff could not establish Esquire was vicariously liable for any damages Zuppardo caused. The court granted the motion, stating, "[Plaintiff] has not shown sufficient evidence of a triable issue of fact. It was after hours, [Zuppardo] was not on a work errand but was coming home from a social engagement. The phone call was with a friend [albeit a friend she met at work] talking about personal matters. [There was n]o evidence they were talking about work matters." Plaintiff appealed.

---

[1] She also named two apparent family members of Zuppardo and Doe defendants.

DISCUSSION

The only issue on appeal is whether plaintiff created a disputed issue of material fact concerning whether Esquire may be held liable under a theory of respondeat superior. In an appeal from a summary judgment, "we independently examine the record in order to determine whether triable issues of fact exist to reinstate the action." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) "In performing our de novo review, we view the evidence in the light most favorable to plaintiffs as the losing parties." (*Ibid.*)

"The rule of respondeat superior is familiar and simply stated: an employer is vicariously liable for the torts of its employees committed within the scope of the employment." (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296 (*Lisa M.*).) "'A risk arises out of the employment when "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer. [Citation.]'" [Citations.] [¶] Tortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment. [Citations.] So may acts that do not benefit the employer [Citation], or are willful or malicious in nature [citations]." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 209.)

However, "[t]hat the employment brought tortfeasor and victim together in time and place is not enough. We have used varied language to describe the nature of the required additional link (which, in theory, is the same for intentional and negligent torts): the incident leading to injury must be an 'outgrowth' of the employment [citation]; the

risk of tortious injury must be "'"inherent in the working environment"'" [citation] or "'"typical of or broadly incidental to the enterprise [the employer] has undertaken."'" [Citation.] [¶] Looking at the matter with a slightly different focus, California courts have also asked whether the tort was, in a general way, foreseeable from the employee's duties. Respondeat superior liability should apply only to the types of injuries that "'as a practical matter are sure to occur in the conduct of the employer's enterprise.'" [Citation.] The employment, in other words, must be such as predictably to create the risk employees will commit . . . torts of the type for which liability is sought." (*Lisa M.*, *supra,* 12 Cal.4th at pp. 298-299.)

"Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.' [Citation.] In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment." (*Mary M. v. City of Los Angeles, supra*, 54 Cal.3d at p. 213.)

Here, plaintiff has only one theory of respondeat superior liability: that Zuppardo was calling Halkett concerning a scheduling issue for a deposition. Plaintiff contends this would support a finding of respondeat superior liability, citing *Miller v. American Greetings Corp.* (2008) 161 Cal.App.4th 1055. There, the court held that a work-related phone call more than eight minutes before a driver hit a pedestrian did not create a disputed material fact that could give rise to respondeat superior liability. (*Id.* at pp. 1062-1063.) In reaching this conclusion, however, the court recognized that, in some cases, a cell phone call clearly would give rise to respondeat superior liability: "We envision the link between respondeat superior and most work-related cell phone calls while driving as falling along a continuum. Sometimes the link between the job and the accident will be clear, *as when an employee is on the phone for work at the moment of the accident.*" (*Id.* at p. 1063, italics added.)

8

Esquire, however, presented testimony from both Zuppardo and Halkett denying they were discussing anything concerning work. This testimony was supported by the undisputed evidence that Zuppardo only made after-hours work calls on rare occasions, and that it was not within her usual job duties. It was also supported by evidence that the two were friends. The issue, therefore, is whether plaintiff presented substantial evidence to dispute their testimony.

Plaintiff contends a jury could reasonably infer they were discussing a scheduling matter based on various pieces of circumstantial evidence. Plaintiff's starting point is the discrepancy between Zuppardo's testimony that she and Halkett spoke frequently on her cell phone, and Zuppardo's cell phone records that reflect no calls between the two prior to the night of the accident. We agree that this is strong evidence bearing adversely on Zuppardo's testimony about the closeness of their friendship.

This evidence is not enough, however, to conclude the two had no friendship at all. Halkett corroborated Zuppardo's testimony that the two were friends. Halkett did not make any claims about the frequency with which the two spoke on a cell phone in particular, but she did testify that they spoke daily and saw each other a couple of times per week in the office. She also testified to specific activities they had enjoyed together outside of work.

Plaintiff's only response to this was to suggest Halkett had a reason to lie. In particular, Halkett testified that she valued her relationship with Esquire, had a good arrangement with Esquire regarding her earnings, and would not want to do anything to upset that. At the time of her deposition, 99 percent of Halkett's income came from Esquire. After Halkett learned about the lawsuit, a manager from Esquire contacted her and they had an in-person meeting at Esquire's offices that lasted a few minutes. The manager mentioned that Esquire was being sued and that an attorney from Esquire would want to speak with her. A couple of months prior to her deposition, Halkett was contacted by an attorney for Esquire, and they had a two minute phone conversation. The

attorney mentioned that plaintiff wanted to depose her and asked her to review the police report for accuracy. The lawyer also asked her if she and Zuppardo had been talking about work at the time of the accident.

None of these facts offer any true factual dispute about the substance of Halkett's testimony. At most, they marginally undermine Halkett's credibility, but merely offering reasons why a witnesss might have an incentive to lie, without offering any evidence to suggest Halkett actually was lying, is not enough to create a disputed issue of material fact. In most respondeat superior cases, an employee's testimony will be crucial to the defense. Summary judgment would become virtually impossible if merely pointing out that an employee's interests are aligned with the employer were enough to not only undermine the employee's testimony, but also prove the *opposite* is true. That is not the law.

Rather, the law is clear that summary judgment may not be denied solely on the basis of the credibility of the moving party's witnesses. Code of Civil Procedure section 437c, subdivision (e), provides, "If a party is otherwise entitled to summary judgment pursuant to this section, summary judgment shall not be denied on grounds of credibility . . . , except that summary judgment may be denied in the discretion of the court if the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact; or if a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof." Neither of the listed exceptions applies here. Zuppardo's and Halkett's testimony was not furnished in the form of a declaration; rather, they testified at depositions where they were subject to cross-examination. (See *Morales-Simental v. Genentech, Inc.* (2017) 16 Cal.App.5th 445, 460 ["Code of Civil Procedure section 437c, subdivision (e) focuses on the inability to cross-examine a witness who has not been deposed, but has submitted a declaration or affidavit."].) Nor did the material fact concern Zuppardo's or Halkett's state of mind.

10

Code of Civil Procedure section 437c, subdivision (e) embodies the principle that disbelief of a witness's statement is not proof that the opposite is true. (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205 ["the disregard or disbelief of the testimony of a witness is not affirmative evidence of a contrary conclusion"].) Plaintiff rejects that principle, however, relying heavily on *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832 (*Donchin*), which we find distinguishable.

The issue in *Donchin* was whether a landlord had actual knowledge of the dangerous propensities of two Rottweiler dogs who bit the plaintiff. (*Donchin*, *supra*, 34 Cal.App.4th at p. 1838.) Early in the case, the landlord denied even knowing the existence of the dogs, but it later came out that that was a lie. Nonetheless, the landlord continued to deny knowledge of the dangerous propensities of the dog. (*Id.* at p. 1835.) The trial court granted summary judgment, but the Court of Appeal reversed. (*Ibid.*)

The court reasoned, "There is more than one way to prove the existence of a fact, and thus more than one way to create a triable issue about the existence of that fact. One way is to introduce affirmative evidence tending to show the fact exists—the testimony of someone who observed it or who observed something from which the existence of the fact may be inferred. Another way, however, is to introduce evidence tending to show an opponent's denial of the existence of the fact is to be disbelieved, that is, evidence challenging the credibility of his denial. For, as a matter of common sense as well as formal logic, to *disbelieve* the *denial* of the existence of a fact is to *believe in the existence* of that fact. (For example, a defendant's alibi defense denying he was at the scene of the crime but rather was somewhere else is proven false. The jury thus disbelieves his denial and instead believes he was at the scene.) [¶] This alternative form of proof becomes especially important when the 'fact' at issue is a party's state of mind—whether it is the party's psychological condition, attitudes, motives, or as in this case, his knowledge. It often will be difficult for others to know what a person knows or

11

does not know. They cannot peer into his brain and unless the party tells others about what he knows there will not be witnesses who can testify about what is going on inside." (*Donchin*, *supra*, 34 Cal.App.4th at pp. 1839-1840.)

Here, the important point of distinction is that *Donchin* involved the witness's state of mind. Section 437c, subdivision (e), specifically permits a court, in its discretion, to deny summary judgment where the only issue is the credibility of a witness making a statement about state of mind. That exception simply does not apply here, where two witnesses testified to an objective fact: the topic of their conversation.

But we are also uncomfortable with the reasoning in *Donchin* for at least four reasons.

First, *Donchin* did not cite section 437c, subdivision (e), which seems to directly contradict some of the broad pronouncements in *Donchin*'s rationale.

Second, as a matter of *formal* logic, *Donchin*'s rule holds, if at all, in the context of a witness's mental state, but not in many other contexts. Thus, to disbelieve the landlord's statement about the dogs' dangerous propensities, one could only conclude the landlord *believes* they are dangerous, not that they actually are dangerous. Since the issue was the landlord's belief, that reasoning held. But imagine a different case where a witness testified the light was red, but then evidence emerged that the witness was nowhere near the light at the time. We would not conclude the light was green. Nor would we conclude the light was yellow. We would simply conclude the witness was lying in affirming the belief the light was red. Formal logic could take us no further.

Third, facts rarely come in binary pairings such that a disbelief of one fact necessitates belief in its opposite. Here, for example, the testimony concerned a topic of conversation. Formal logic cannot get us from disbelief that the witnesses were talking about Halkett's son, to an affirmation that they were scheduling a deposition. "The rejection of a witness's testimony by the trier of fact has only the effect of removing that testimony from the evidentiary mix. Without more, the disregard or disbelief of the

12

testimony of a witness is not affirmative evidence of a contrary conclusion." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205.)

This leads to our fourth criticism, which is that *Donchin* gave inadequate attention to the need for a plaintiff to present *substantial* evidence. The point of the summary judgment procedure is to test whether the plaintiff has enough evidence to support a jury verdict. Substantial evidence, however, is not synonymous with *any* evidence. Rather, substantial evidence must be sufficient to support the essential elements underlying a verdict. (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 314.) Take the example *Donchin* invoked about a criminal defendant lying about an alibi. That evidence may be relevant, and thus admissible, on the question of the defendant's guilt, but it would certainly not be substantial. That is, we would not uphold a jury verdict if the *only* evidence tying the defendant to the crime was a false claim about an alibi. Here, the inference that Zuppardo lied about the extent of her friendship with Halkett may be relevant to the ultimate issue of whether they were discussing a scheduling matter in the sense that it tends to show a consciousness of guilt and thus can give credence to other evidence of guilt. But a lie about the extent of their cell phone contacts is not *substantial* evidence about the actual topic of conversation that night.

Substantial evidence could have taken many forms, even in the face of Zuppardo's and Halkett's contrary testimony. For example, plaintiff could have shown, if true, that Halkett had been scheduled to work the next day, but then was called off, or vice-versa. Or that Zuppardo received a call from the office or her manager immediately before calling Halkett, which might suggest the call to Halkett was in response to that. We are not suggesting any of that is true. Rather, we are illustrating that plaintiff needed something more than just shots at the defense witnesses' credibility to constitute substantial evidence. Plaintiff did not offer any such evidence, however, and thus the court properly granted summary judgment.

13

DISPOSITION

The judgment is affirmed.  Esquire shall recover is costs incurred on appeal.

IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.